This is the second day of this panel sitting, and we have two cases on the docket to hear oral argument on today. First of all, I wish to advise counsel that you should assume that we have read all of the briefing in connection with these cases, and we're familiar with the arguments you've made in the brief, as well as some of the key cases that you've cited in support of those arguments. If you could tailor your remarks accordingly, that would be great. You are also familiar, I'm sure, with our lighting system at the podium. Green light will be on from the time you begin. Yellow light will be on when you have two minutes remaining. When the red light goes on, we ask that you complete the sentence that you're in and conclude your remarks. Okay, we'll go ahead and get started. The case is Harris County, Texas v. Louis Dreyfus Company, Houston Export Elevator, LLC. Ms. Moskowitz, if you'd like to begin, you may approach the podium. Thank you, Your Honor. I please the Court. Again, Lauren Moskowitz for Louis Dreyfus Company. I will hopefully be able to refer to that as LDC to save some words. This case, Your Honors, is about due process. The errors that we raised that the trial court made deprived LDC, the defendant, of a fair trial. That is what happened here on a number of issues. We raised a fair number of issues, and I appreciate that Your Honors are familiar with the issues. I would like to touch on first briefly the lease interpretation issue, because that did really pervade the entirety of the proceeding and infected every evidentiary ruling all the way to the jury instructions. What happened there was the trial court failed to follow Texas law in interpreting that contract. We don't disagree on what the standard is for review of interpretation of contracts. It is, you have to read the contract as a whole, you have to give meaning to the words on the page, you have to interpret it to give effect to the intent of the parties, and you have to be practical on trying to understand what the parties intended by that. What we have here is an unambiguous reading. The parties do agree that it's unambiguous, but what we have is an unreasonable interpretation that the court offered and the district court adopted with very little reasoning. The Genova review that Your Honors are entitled to do here require a real reading of this contract and the provisions as a whole. And what that requires, when you look at the section 6.06, not just A, not just B, not just C, these don't get read in isolation. That is exactly the opposite of what the contract law requires under Texas law. You need to look at all those provisions and try to understand what the court is asking the court to adopt here is a reading that gave the tenant, wrote a blank check to a landlord. That's not what a sophisticated tenant would do. If you look at all the other . . . It includes, as you say, A, B, and C. What specific language are you relying on to suggest that part C is intended to modify both A and B? Your Honor, the contract as a whole, there's a number of provisions that help us get there, but let's just start with A and B. The purpose of A and B, and I actually don't think there's a dispute here either, is to assign the who. Who has responsibility to do certain things when they need to be done? A says the tenant is required to do the repairs when they're needed in the facility. B says tenant again for the rail track. And of course, you look down to F, and it says the landlord does the wharf and fendering system. So there is an assignment of responsibility. But what those provisions don't answer is when do you have to do it? And you have to find the It's right in the next provision that says that the tenant is required to maintain the premises in a good, safe, clean, operable, and well-kept condition. So that is the standard that is supposed to apply. If it's not in that condition, and the facility is what's at issue, the grain elevator, then the tenant has to do it. If the rail trackage is not in a good, safe, clean, well-kept condition, the tenant has to bring it back to that condition. That's all that those provisions together require. And when you look at the other provisions, starting even at 6.03, as just one example, that specifically says the tenant cannot do certain improvements without written consent of the landlord to certain equipment unless it's part of what is 6.03. 6.08 talks about going above and beyond the standards and requirements of 6.06. Well, the court says there are no beyond. Everything is required there. What could normal wear and tear even mean to be accepted in 6.06c if their interpretation and the court's interpretation is right? Of course, if there's normal wear and tear, something could be done to improve or repair that. But 6.06c says we don't. The tenant didn't have to do that. But the court's saying yes, they did under 6.06a. You cannot read provisions of a contract to be in conflict like that. You have to apply the words and the contract as a whole. Moving to the second issue, which is the exclusion of the evidence that the absolute efficient and beyond operation of the same facility that the court argued was at, near, or beyond its useful life. That evidence was completely excluded by the court without any sound and acceptable reason. That is error. That is the error of one of the most prejudicial kinds of error, to prevent a defendant from being able to present to the jury the probative evidence of the core question of how this facility was left at the end of the lease. That is all the jury is being asked to decide, and it was kept from them. The judge had no basis for doing it. The ruling was, as you saw in our brief, this period that the judge came up with. And I understand courts need rules of thumb sometimes, and they may try to give guidance. But that doesn't substitute for a ruling on the actual evidence presented. Did I notice correctly that he included the last two months, the two months beyond your client's lease? That's correct. Nothing more. Nothing. And you wanted to go into the year, the subsequent tenant. Absolutely, Your Honor. There is a fundamental difference between did this thing keep kicking for two more months when the court is saying it's at or beyond its useful life, and four more years of at great performance. In fact, the witness who was going to testify to that was the same witness who authored some of the documents that the court was pointing the jury to, saying this stuff was broken. But he continued to run it for the next tenant for four more years at or above the levels of throughput, the how much grain you were getting, beyond what we were able to achieve during our tendency, without having made the substantial repairs the court was saying was absolutely necessary to keep this thing operable. That was such critical evidence. There is really no basis to have excluded that. You may hear, and you saw in the briefs, this reference to the lease that the next tenant entered into and the deal that they struck, that they weren't going to have to do any repairs while they litigated this case. That's a complete red herring. What we wanted, it doesn't matter why those repairs weren't done. It matters that they weren't, and the facility kept going at a clip. That jury needed to hear that. It is not harmless error. It is the complete opposite. For that to be harmless, this court needs to be certain that it did not affect the outcome. No one can say with the conviction required, for example, in EEOC versus Manville, this court cannot say with the conviction required by your precedent that the jury's verdict would not have been affected, that the jury's deliberation would not have been affected by hearing this evidence. It was the core evidence that we needed to present, and we were prevented. The third issue is a bit of a bucket of issues, I recognize, but it's really important. The judge here failed to fulfill the gatekeeper role. That is one of the most critical roles a trial court can serve in a trial, in making sure that due process is carried out. We have an expert witness that was put on the stand for a third or more of the trial time with the imprimatur of being an expert, and he was allowed, over our objection, a repeated objection, to testify as to the opinions of other non-testifying experts. Your honors have not had the occasion, it seems, to write an opinion making clear that that's not allowed. Other circuits have, and your honors have cited those cases previously. The Seventh Circuit has written on it a lot. We cited a couple of those cases, the Dura case and the In re James Wilson case, which your honors, this court has cited previously. It is black letter law under Rule 702 and 703 that the expert has to testify only to the areas in which that expert is qualified. We are not having a battle of qualifications here. It is undisputed that Dr. West was only qualified as a structural engineer. He agreed, he conceded he was not an expert in mechanical engineering. He conceded he was not an expert in electrical engineering. And experts typically testify as to facts that a typical practitioner in that field would reasonably rely on as part of normal practice, even if it's like the way you just mentioned, like a mechanical engineer or something like that. An architect maybe who is an expert can testify about things that relate to mechanical engineering and so on. I would disagree slightly with how you put it, your honor. An expert can rely on other facts or data that an expert in that field would normally rely on in reaching that expert's opinions in the area he or she is qualified. So, for example, an architect, of course, can rely on a general contractor to give a sense of what is doable. Do you need a beam or not? Or something like that. But if the issue in the case is whether a beam is required, the architect doesn't get to testify to that. You need the contractor whose opinion is at issue to testify. So that's what happened here. It wasn't that Dr. West was relying on these other experts to reach his opinion in structural engineering. He conceded he didn't even look at the opinions and didn't even review the opinions of the mechanical engineer or electrical engineer. He said, I have no idea. I can't testify to those issues. I can't be cross-examined on those issues. He didn't even review, for example, the cost estimates of the mechanical and electrical systems, which were two-thirds of the damages that he was presenting to the jury as his own opinion at the end of the day. That is absolutely forbidden. You cannot be a mouthpiece. You cannot smuggle in and challenge your opinions. But that's completely ineffective when the jury has been allowed by the court to hear it as expert testimony. The only thing to do is to exercise the gatekeeping function and keep that out. Limit experts to what they were qualified to do. Finally, the final blow in the case was what happened . . . Is there a motion in limine filed with regard to the expert? Yes, Your Honor. We filed Daubert motions raising all of these issues that Dr. West was not qualified on any of these subjects, including cost estimation. We also raised the issue that the cost estimates that were being offered were unreliable, this Class V damages estimate issue, which we raised and we raise again here. There is some precedent in the Fifth Circuit for this issue, which is the Massey case that we cited, the Gamora case as well. The notion that you can turn a back-of-the-envelope estimate that construction industry uses at the outset of a project and transfer that into enough evidence to reach a damages verdict on a lease, on a contract, that is error. They never should have been allowed to be presented to the jury. We raised that below and they were allowed in. Again, that is a failure of the gatekeeping role for the court. The judge needed to exercise his gatekeeping function by keeping unreliable evidence out of the jury's ears. So what happened there was the jury rendered a verdict based on unsupported speculation and conjecture. That is what needs to be set aside. They cannot do that. The court points to a hodgepodge of other documents that they say supported those damages. That's not what they argued. That's not what they disclosed in their Rule 26 disclosures. That's not what they had Dr. West get up there and argue. Dr. West gave the numbers from the WJE report and his expert report. The fact that they're pointing to these documents, that's not correct and that's not allowed. You can't revisionist history what happened at the actual trial. The WJE report was a hearsay document made for litigation and allowed in with no real instructions other than to consider it only for what was required under the lease. There was no instruction on what was required under the lease. The jury was told to read the provisions that were excerpted for them and that each provision was independent. That's the only guidance the jury got from the trial court. They needed more. They couldn't fulfill the role that they had to fill of providing that fair due process trial. They couldn't do it. They weren't given the tools. We need a new trial where the real issue here when we got ambushed at closing with numbers that we had never seen. There was no objection to that. How does your argument survive the lack of an objection? Your Honor, this is a Hobson's choice that the defendant was facing then. I've been there. Openings and closings, it's really hard to object without basically ruining the outcome. To object to that and make a big deal of the numbers, the 15 to 25 million number that the court threw out for the first time in closing, what could have been done? The jury had heard it. The cat was out of the bag. I certainly understand sitting here saying, gosh, it would have been nice if they had objected for my appeal purposes, but in reality and in practicality, nothing could have been done other than a new trial at that point. They waited until the last moment. We couldn't call a witness. We couldn't ask for the continuance. None of the things that the reason you ask for an objection to cure were possible at that point. Even the district court admitted . . . I'm sorry. Counsel, before we conclude, I wanted to . . . we normally do the supplemental declaration that you filed on the LLC jurisdiction because, as I understand our precedent, we can't entertain declarations like that at the appellate level. What we need is pointing to evidence in the record of the LLC's citizenship. I take it from the deck, but tell me if it's an unfair inference that there isn't such evidence here. Your Honor, I think the issue is that the word ownership was used instead of sole membership, but that is . . . the same facts were presented below, but I think correctly pointing out we used the wrong words, but there is not a dispute that those facts are true and that we were not a citizen of Texas for purposes of diversity, jurisdiction, removal jurisdiction at that time. Thank you, Your Honors. Thank you. Okay. Let's hear from Ms. White. May it please the Court. The jury verdict in this case came after a hard-fought trial where the parties vigorously litigated the legal and factual issues. I disagree that there is any problem of due process here. I'll focus on some of the points that Dreyfus' counsel made subject to questioning from the Court, and I'd like to start with the lease interpretation. We are not saying that the provisions of 606 are read in isolation. I completely agree that we have to read contracts in their entirety. The Port's interpretation of this contract gives meaning to all of 606, including 608 and 609, and I'd like to point out that in our brief, we explained the purpose of 608 and 609 under our interpretation of 606, and Dreyfus has not responded to those points. A tells the parties that Dreyfus is responsible for repairs. B is repairs to the railroad. C is about maintenance, and the Court, I know from reading our briefs, recognizes that repair and maintenance are different words, and maintenance is concerned with things like normal wear and tear. Counsel is arguing that if Dreyfus has to make all repairs, there will never be normal wear and tear, and that's just not correct. The point is that repairs happen when something is broken. And so A is about when things are broken. C is about when they're not broken, but maintaining them in such a way that they don't break down. 608 is about improvements that might be made when things are not broken. So we don't think 606 is limitless. It's not about making improvements, any limitless theoretical improvements someone can make. It's about when something is an improvement. You could make it better. You don't have to, though. You could repair it. The point is that they did not do those things, and they've characterized us as applying some retroactive theoretical limitless standard on them, but that is not what happened, and I think that's important to clarify what the Port's case was. We took a report that they obtained from their expert River in 2015, and they've argued that that report was not meant to tell them what repairs need to be made during the lease, and they had a witness testify to that, but the document itself, and this is at record 12574, states that all of the repairs River was recommending needed to be done within three years. So it was not some 20 years into the future document. It was the three years there would have been a little bit on the end of the lease that wouldn't have been covered. How does that, I'm sorry. Yes. If it's three years, I don't understand the Hughesian period. Like, you've lost me from the jump, because if it's working fine for three years, then, or four years. So, Your Honor, I think that the problem with, there's two issues here. The problem with their argument about if it's continuing to work fine, what is the issue, is a distortion of what useful life meant. So at trial, when witnesses were talking about useful life, they did not mean it isn't working. It's inoperable. They said things like, it was prone to breakdown. Like, it has gotten to a point where the breakdowns are regular. And I completely understand, but I'm not on the jury. Right. If the Hughesian period and the instruction to the jury is, you get two months at the end of the lease period and then that's the end of the Hughesian period, you need to tell, I have that dispute in front of 12 jury members, not me. And Your Honor, we did. So the issue is that they did put in evidence that for two months after the lease, and of course this two month period was never told to the jury. They didn't know they were only hearing two months. What they heard from Mr. Mullins on the stand was that the thing was continuing to operate. So, and that the repairs that we were complaining about had not been fixed. So the impression that Dreyfus wants, which was that this thing continued to operate perfectly, which we disagree with, but that's the impression that they wanted. That is the impression that existed. Because we were not able to offer any evidence about why four years later there hadn't been repairs. They weren't allowed to offer evidence about four years later it's still running. But the impression that they wanted is what the jury heard. And they made that argument in closing. They said, Lansing's operating this at the same rate that we think. They made. The fact that that same status quo that the jury heard continued for four years doesn't change the fact that the impression they wanted is the impression that they got. As I understand it, your claim is for repairs that should have been, that were identified in the 2015 report, but were still left undone. Correct. That's correct, Your Honor. Are there any others that are involved in the case or just the ones that were in that report? There's two other categories. So they are, they derive from that report, but they have other supporting evidence. So one is the shiploading towers and that's the grain gets onto the boats that way. River identified that, River is the 2015 report. It identified those as a danger of catastrophic failure and they were priority one. They needed to be repaired immediately. Now, River didn't do a cost estimate or anything like that. And what we have in the record is evidence of Dreyfus internally discussing what are we going to do about these towers and getting estimates, working on estimates internally. And what they did was they did Band-Aid type repairs. They didn't want to actually do a full repair that would address the issue. So for the shiploading towers, there's other real-time evidence from Dreyfus that supports those repairs and the cost of them. The second other category is a dust control improvement project. So Dreyfus and River, like I said, they derive from River. River had identified this as a problem that much of the dust control system in the facility really needed work, but River acknowledged Dreyfus is already underway trying to fix this. So River identified it but thought it was getting addressed. Dreyfus then abandoned that project in 2017. And the evidence in the record that we relied on was internal Dreyfus documents and work about that dust project, which they had started and then abandoned. And we sought damages for that as well. And those are based on the Dreyfus documents about the work they did and then abandoned. So those are what I would call sort of the three categories of damages. But as you can hopefully discern from my explanation, all of that derives from stuff that River or Dreyfus identified. So we are not coming in, Dr. West and WJE, which I would like to address, they did not come in at the end of the lease and say, you should have done this, that, and something else three years ago. We are relying on what Dreyfus identified as needing to be done and did not do. What Dr. West and WJE did, and I think this distinction is important on the expert admissibility issue, because Dr. West had two roles. WJE was hired by Port's internal engineering team in September 2018. That does not have to do with this litigation. This litigation started in February 2019. So when WJE was hired and Dr. West was the principal engineer when they were hired, they were not hired as testifying experts. They were hired because the Port had gotten the linear report, another one of these reports in the record, and realized we need to have someone go in and do a very thorough look at this facility because it looks like there are things that are wrong with it. So the Port, their engineers hire WJE, who goes in with an interdisciplinary team, mechanical, structural, electrical, and cost estimating. And they put together this WJE report, which was not a litigation project. This was the Port getting engineering work done for the Port's purposes. And that's one . . . The report's introduced into evidence. That report is. Yes, but that report also, correct me if I'm wrong, includes information or coverage for periods outside of what the district judge proclaimed to be the Hughesian period. In other words, the period of relevance to the case. That's correct, Your Honor, and that was addressed. We agreed that that was not the proper use of that report. So that was addressed in two ways. The Court gave an instruction and also Dr. West on the stand said, and this relates to his testifying expert work, which I'll get to in a second. He said on the stand, the testimony I'm offering today has nothing to do with the repairs that we recommended for 30 years in the future. It is about . . . because what Dr. West was testifying about at trial was that he had done work after WJE to figure out where was the overlap between the River report in 2015 and what WJE saw when it went out. Let me ask you one more question about . . . counsel argued about the going beyond the two months after the lease. As I understood the record, correct me if I'm wrong, one of the reasons or the primary reason that the district court would not go beyond into the next tenant's time there is because it wasn't certain that the lease was the same. It was actually known that the lease was not the same. The point of demonstrating what happened well beyond the two months into the three or four years after under the new tenant was to show that the equipment, the property could be used for maintenance. What difference does it make that one lease is different than the other? It makes a difference for two reasons. The first is that that new tenant's lease didn't require them to make any repairs. All they were doing was what I would truly call band-aid repairs, like just to keep it going. The testimony that Dreyfus is complaining that was excluded is about five lines of questioning where Mullins actually says, oh no, the new tenant did do some things like we've replaced these dust things that broke . . . . . . I'm sorry to interrupt. No problem. My apology, but I guess my point is they're arguing that the repair, some of the repairs at issue in this case were not needed throughout the time of the new tenant. If I understood the argument correctly, they wanted to show that, hey look, they've been there for now going on because they're still being operated in the same fashion. That's how I understood the argument. That is the argument, Your Honor. I think the problem is again this construct that Dreyfus has invented that repairs are only necessary when something doesn't work, when it is literally inoperable. Our position, and this was argued to the jury, but both these points, is that that is not correct. This is a very complicated facility. The drag conveyors are a good example. The drag conveyors themselves may be operating, but there could be slide gates that aren't working. There's components of it that need to be repaired. Then there's the question of whether the entire thing needs to be repaired or replaced. Our point is that those repairs may involve . . . and this happened at trial. We went through little slide gates that needed to be repaired, holes that needed to be repaired. We're not talking about you should have just replaced this entire thing for all the equipment. Some of the equipment we did. My point is that what Dreyfus is saying is it didn't need to do any of that so long as the thing is running. That's their point. That's what they're arguing. It was running four years later, so those repairs don't need to be made. I understood the argument to be the difference between maintenance and repair. We sought damages for both. The repair damages was the larger number, the $20 million. Maintenance was $200,000. We'd actually asked for about $495,000, and the jury gave us $200,000 on maintenance. On repairs, though, the way I think about this is like a car analogy. What Dreyfus is saying is that you just keep driving the car and do no repair work until it literally will not start. That's not how we think about repairs. A tire is a good example. They're saying the tire is running low. There's something wrong with the tire, but the car is continuing to drive, so why would I repair it? That's contrary to the common sense understanding of repair. That's contrary to what the experts in the case said. Mullins, who Dreyfus designated as an expert and we called, said that normal repair work in a facility like this means fixing little things as they arise. You don't wait for the entire piece of equipment to fall apart. You're repairing components of it as needed, and our point is that they did not do that. Can we stick with the car analogy? I saw it in your brief, and it makes sense to me, but the oil change is maintenance, right? Correct. That's exactly right, and we used it for that purpose in the brief. Perfect. So if they're not maintaining the property, I understand that you have $200,000 in damages for that because they're not changing the oil. And obviously, if you don't change the oil in your truck, the truck will eventually stop running, so I'm totally with you. The thing I don't fully understand is how the repair obligation gets triggered periodically. When you're talking about this sort of like, oh, we need to keep it moving and et cetera, that strikes me as a maintenance issue, not a repair issue. Repair issues would be, well, the alternator is out. The car won't start, so maybe I failed to maintain the battery. Maybe I failed to maintain the electrical system. However, I screwed up my alternator. Now, the truck won't start. That's clearly a repair. That's not maintenance. But that's sort of a – it's an off-on dichotomous variable, right? It's working or it's not. I see. I see your understanding. So if I'm understanding it correct, a repair – you're asking a repair seems that it would only be triggered when the thing literally won't turn on. Okay, so I think then on the car analogy, I would point to a couple other components on a car, and then I would point out that this is where the analogy sort of breaks down because this equipment is so much more complex than a car. But as an example, let's say that air conditioning on your car doesn't work. So the car will turn on, and you can use it. But if you're in Louisiana or Texas in the summer, you definitely need air conditioning. So that's an example of where we would say there's repairs needed, but the thing is running. Or the window is stuck down, right? Like you can't get the window to roll up. Now, in a car, those are the sort of things that we think of as creature comforts, and that's why I said this is where the analogy breaks down a little bit. But those are things that need to be repaired on a car, but the car is still running. With this facility, like I said, we weren't taking, like, a huge piece of equipment and just saying the whole thing's broken. All the experts that we relied on and the way we presented the evidence was actually going in and showing particular components of the equipment that needed repair. And the reason I say useful life is about whether it's prone to breakdown is that it will turn on and it will work, but because of all the components needing repairs, it's not working reliably. And that's the thing. So when I'm looking at this exclusion of evidence from 10,776 to 10,780 that your friends on the other side have pointed to, the colloquy that I'm looking at, the way – again, I wasn't there. I was just looking at the paper record, but what sounds like is going on is they want to put on evidence to show – and I'm sorry. I realize you offered the analogy in the brief. I recognize that it's breaking down, so tell me if it's unfair and we need to shift off of the car thing because I want to be sensitive to that. But if we stick with the car for just a minute, I drove my truck for 35,000 miles last year. I drove it for 35,000 miles in year two and 35,000 miles in year three and 35,000 miles in year four and five and six and whatever. It should be probative to the jury's mind that it's working okay. In Texas, I would be driving it for 1,000 miles without air conditioning, right? And so you can infer from the fact that it's continuing to run 35,000 miles every year that whatever was going on, maybe I didn't maintain it and it's going to break down in year seven. Totally fine. Argue that to the jury, but it certainly doesn't need to be repaired. It's running at the same clip every single year, year in, year out, and it looks like on the throughput statistics that they wanted to put forward or whatever this evidence is. I don't have the email transcript. That's what they wanted the jury to hear. So two points in response, Your Honor, and I'll start with one I've already made, but I think it really is important here. Because of how the evidence was presented to the jury, that is what the jury heard. The jury didn't hear like this is only for two months. The jury just heard the new tenant moved in, new tenant's doing great, everything's fine. And then they heard silence from the court. So the impression is that it was continuing to run indefinitely. Fine. The second point I'll make is that when we say it was running at the same efficiency, I think it's important to remember what the evidence showed at the end of the lease, which is that you had things prone to breakdown. And Gibson, their expert, recognizes that there's a point where things are breaking down so much it no longer makes sense to just let them keep breaking down. But that's what Dreyfus was doing. That's what the new tenant continues to do because it doesn't have a repair obligation. So this idea that it was running perfectly, if they'd gotten into the four years, you could say it's running the same, but that does not mean that Dreyfus met its repair obligation in the lease. And then the last point I'll make is that I do think this is where the car analogy just starts to break down a little bit, but not completely. If you take that lease provision and put it to a car, first of all, if you drove a car like that in Texas for that many miles, I feel like it had to be a Toyota with that many problems. But if I agree to take your car and make all repairs and maintain it, and I give it back to you, and yes, it turns on. But the windows don't work. The AC is out. And I actually had a car that this happened to. I could only turn it on with using a jump pack. Like, I had to use a jump pack to get the battery to start to get the car to start. And I gave it back to you, and I said, you can run it. Just do this. Use this jump pack. Put it out on the battery. Yeah, the windows don't work, but, you know, bring a bottle of water. You'll be happy. You'll be fine. That would not be compliant with your obligation to make all repairs. And once again, I'm not saying all improvements. I'm not saying that I promised you I'd give you a new car. I'm not. But I'm going to give you a car back that's in the condition you gave to me, and that isn't what happened here. And the thing about this facility is that it's not the kind of thing you can just take to one mechanic and get fixed in a day or a week, right? Like, a lot of these projects Dreyfus was working on were going to require years of planning. That's why they were looking at this stuff in 2015. And I see I'm about out of time. So if the court doesn't have any other questions, thank you, and the court should affirm. Thank you, counsel. Counsel, I believe you had reserved four minutes for rebuttal. Yes, Your Honor. Thank you. Maybe just starting with the car analogy, Your Honor took the words out of my mouth. We were entitled to offer evidence to the jury that the car drove for 100,000 more miles. I'm happy to hear that in closing argument. Everything counsel just said is a great closing to contend with that evidence. But we had to have that out in front of the jury. That's not evidence that should have been kept from the jury. It was probative. It was relevant. It was not prejudicial. It was not just because evidence is bad for the other side doesn't mean it's unfairly prejudicial. This court has said that over and over again. We were entitled to present that evidence. The court says, don't worry. We're not asking for improvements. We never really said improvements. Yes, they did. They repeated it over and over again, how broad 606A was. In their opening statement, they said it a number of times. At 105.28, at 105.30, at 105.33. Characterizing our argument as saying the court wants an upgrade, they say 608 says what it says. All repairs and improvements, including replacements. They said extraordinary three times. They said improvements on its own. They said replacements of all varieties, not just the ones required by law. They called 606A the extraordinary repair and replacement requirement. They did ask for that. They also said in their brief, well, don't worry. The jury didn't award damages for improvements. They don't know that. They were told, the jury was told to read 606A and that it stood alone. That's it. They talk about maintenance. That word is nowhere in 6.06C. It is in the heading, which later you're told to disregard. And it was there for convenience. 6.06C says that the tenant is required to maintain the premises in good, safe, clean, operable, well-kept condition. I might have mixed up the order of that, but that's what it says. And that is what we were required to do. And if it wasn't in that condition, we had to fix it. Repair, they point out this circular definition. Repair means when it's broken. They weren't asking for repairs because the window wouldn't come down. They were saying wholesale replacement of some of the most fundamental, critical systems in this facility needed to be completely replaced.  And the fact that counsel talked about these shiploaders and the dust control system, there's a lot of weeds we can go down. And I don't have the time. But a couple of points on that. One, they didn't disclose those numbers or those sources in their Rule 26A disclosures. They said West's report is all we need to look at for the category and the computation of the category. And when they talk about the River report and the Lanier report, they're completely contradictory to those documents. That's exactly why we have Rule 26, so that I don't have to swim through the sea of paper and guess at what they're actually going to argue to the jury. We were entitled to know, and they told us, to the nearest $10, $12,392,990. I think I have that right. They told it to us time and time again. And that's whether Mr. Mullins wrote in a one-page document a bunch of numbers without any sources for things that he might wish happened six years down the road that add up to $9.4 million. That is not support for their jury verdict here. That is a post hoc rationalization for how they got there. I have plenty more to say, but I'm out of time. Thank you so much. Counsel, thank you. Thank you both for your briefing and your arguments here today. The case will be considered submitted. The next case on our docket this morning is 22-30758.